Page number 20-1495 et al. Duke Energy Progress, LLC petitioner versus Federal Energy Regulatory Commission. Mr. Zetlin for the petitioner, Mr. Edinger for the respondent. Mr. Cheslin, good morning. Thank you, Your Honor. I'm Misha Zetlin for Duke. FERC's orders below rewrite the full requirements contract between Duke and Power Agency, permitting Power Agency to implement a scheme to eliminate its contributions to Duke's fixed costs by deploying grid scale battery devices to service the retail energy needs of Power Agency's customers precisely on a contractual event, one particular hour per month. This we would respectfully submit as a straightforward case of contractual interpretation, reading primarily just two provisions of the contract here. Our position is that Power Agency's deployment of grid scale batteries to services consumers' retail demands is not within the contractual text for demand side management or demand response because the contractual text requires that both of these concepts are limited to modify consumers' patterns of electricity usage. Where does it state that in the language of the contract? I know that's your position. I know your position is that it requires actual production. It requires actual reductions in energy consumption. And affirmative acts by end users, but where is that in the actual language of the contract? Right, so I'll talk about demand side management first, and then I'll talk about demand response. Okay, great. With regard to demand side management, it is the definition of demand side management, and I'm gonna quote the language. Demand side management is defined as quote, energy and load shape modifying activities that are designed to encourage consumers to modify the patterns of electricity usage. So there, the requirement is that the consumers modify their pattern of electrical usage. Here- There wouldn't be a problem under that provision, Mr. Sitlin. It wouldn't be a problem if Power Agency loaned to its largest retail users the batteries and said, here, put these in your, let's say it's a Walmart or something, put this in your electrical intake, and we're gonna signal you when to use them, and it'll change your pattern of electricity usage in a way that's gonna lower everybody's rates. That's not what they did here, but that wouldn't be a problem under Article 1.47 defining demand side management, would it? That's just not what happened here. That's right, that would be a different case. Situations where retail consumers self-supply their own energy rather than Power Agency self-supply- They're not supplying it, but they're storing it, and therefore modifying a pattern of usage, including the timing of demand. So the overall demand would be the same. Nobody disputes that here. Right, Your Honor, that would be a different case. That would be outside of what the order is here, and I don't think that we need to prejudicate that. Situation here is that the consumers are doing nothing. The consumers- Right, now talk about 9.5, because it doesn't have that encourage consumers language. Under 9.5, I think the best argument for your opponents is that nothing is intended to preclude the Power Agency from taking steps to manage or reduce members' demands and or load through the use of pricing information. And that's obviously taking out the communication to consumers, but there's sort of two separate pieces of that clause. And why isn't this within managing demand or load through the use of pricing information on Power Agency's part? Well, Your Honor, I think you just answered your own question, is that would take out that other aspect of the language. It's the use of communicating pricing information to consumers. So that- No, no, no. It's the use or communication of pricing information to Power Agencies or its members, customers. Yes. So communication of pricing information to customers is one aspect, but the use is, it can't be the use to customers, is it? It's the use of pricing information or the communication of pricing information to customers. I think it's pretty clear from that language, which isn't the best draft of language, that it's- No, it's not. The use by the customers. And I will also say that- How do customers use pricing information in that? Well, so let me explain, Your Honor, and this is the way these work. So the customer will sign up for a demand response program, which will send to like an app on their phone that'll say, oh, look, it would cost you a lot of money to run your washing machine right now. No, no, no. This is actually a point of contention or confusion that I have from the briefs. The retail price, I mean, the whole structure here is that the retail price doesn't go up and down. And so it's those who have contracted to provide the energy that are worried about saving costs at peak because the retail customers, they're not gonna pay more at peak. Well, Your Honor, I think that's not a correct understanding. The customers, there could be variable pricing on the customer side. And so the whole point- Is there here? I thought the whole structure was that they have an upfront contract for fixed price and that that creates this sort of lack of supply and demand pressure. It's not costing them more on the peak days. If it were, then the problem would resolve itself because they wouldn't use as much energy on peak days. But that customers are kind of indifferent as to whether it's a peak day or not because they're paying the same amount, no? I don't believe that's right. I believe a demand response program is created is so that the customers can ratchet up, that they can be given savings for- At the behest of the power agency, because the power agency says we're absorbing this cost in order to align your incentives, ultimate consumer with ours, we're gonna sweeten the pot. We're gonna pay you 60 bucks a year. If you agree, then on a couple of peak days, we can duck in and turn up your thermostat. That's how I understand it. And that they need to do that because otherwise the incentives aren't aligned. Am I wrong about that? That's more demand side management. That's when customers sign up for a program where power agency can turn up off and on their thermostat in exactly the way you described. The way the demand response works is that the customers are given a financial incentive to do that themselves. They get pricing information. They say, oh, well, if I run my washing machine at 6 p.m. when everyone's got their lights on, everyone's cooking dinner, everyone's watching the TV, I'm not gonna get that discount. But if I run my washing machine overnight because I got this pricing information, then I'm gonna save a bunch of money because that's, and that is the way the demand response works. But again, that is the fundamental point here is that the consumer has got to do something. The entire structure of both 9.4 and 9.5 is the consumers shifting the time when they use electricity and shifting their consumption. What happens with the deployment of grid scale batteries by power agencies is the consumers are doing nothing. They are blissfully ignorant. They turn on their lights, they turn on their TV, they run their washing machines all at the same time. They couldn't care less. They're not communicating in any way that whether they're getting their retail power as a pass-through directly from Duke's utility at that moment, or if they are getting their power when they turn on their switch, the light switch from a grid scale batteries run by power agencies. So it's your position that just as a factual matter, there isn't a way that a power agency could use pricing information itself to reduce members' demands or a load. That just isn't a category of, so whatever ambiguity there is in the language, it just couldn't refer to that because that isn't an action. Certainly, by the fact that power agency has that information, it can use its powers under demand side management if someone signed up for a program to ratchet off and on the thermostat. But with regard to demand response, that's not how it operates. Sorry, Judge Tittle. Your whole argument is that this contract's clear. Suppose we think it's not. And we owe deference to the commission even on the question of whether it's ambiguous. And so just suppose for argument's sake, we think it's not as clear as you think, and that there's ambiguity in this contract. Can you prevail at that point? Or does your whole argument depend on your claim that this contract is unambiguously clear? Absolutely, Your Honor. So I'd like to quibble with the premise of your question and then answer it directly. I think it's fairly clear from this court's cases, such as Cajun, that if the contract is clear, this is just a Chevron step one issue, and you don't give deference to an agency on Chevron step one, and this is an analogy. I didn't say we did. Oh, I apologize. I'm asking you whether or not, if we think it's not clear, what's your best argument that the commission's interpretation of the contract is unreasonable? I think, Your Honor, in that sort of circumstance, we would be in a Chevron step two world. And under this case, this court's case law, including the recent decision in the Ace case that Judge Pillard was on, if the agency does not show that it is exercising some sort of discretion, it's not recognizing an ambiguity and then attempting to resolve it, then the agency cannot prevail under Chevron step two or this analogy under the Chenery Doctrine. You cannot, for example- You don't think that's what the commission's brief does? I don't see the commission's brief as arguing anything except for the meaning of the contract. But if, Your Honor, do read its brief that way, then I think that it would be foreclosed by the Chenery Doctrine, because they did not, in their order's honor of view, say, well, this contract is ambiguous, Chevron step one. Now we're going on to Chevron step two, and we're going to use our policymaking authority to resolve that ambiguity. They did not engage in that kind of inquiry, and so under Chenery, their decision cannot be upheld under that ground. If, Your Honors, think that the contract is ambiguous, contrary to our submission, then I think the only resolution of this case is to vacate the underlying orders, send it back to the agency, for the agency to resolve any ambiguity that this court would identify in the contract. I have just some practical questions, just trying to understand, and maybe these just go to the equities of the case, but how much of the total power demand comes from power agency? One thing that I wondered about is whether it's possible that by discharging their batteries at the hour they think is going to be the peak, they're going to actually prevent that hour from being the peak, because it's a feedback loop. Your Honor, I don't believe it's on the record, but they're about 10% of what Duke outputs, and there's nothing in the record that I know that would answer your question any further. And is the battery capability big, or how marginal is that? I believe this is all in the nascent phases. I believe they're asking FERC to approve this so that they can then deploy these grid-scale batteries at a very substantial rate. And our primary concern here is they're going to deploy it at such a rate that they're going to completely eliminate their contribution to our fixed costs. So that was my other question about fixed costs. The capacity charge, is that the only place that fixed costs, or is part of the energy charge also includes some element of fixed costs? Because in the past, I had thought that capacity was really about future capacity, but I know different markets are structured differently. And you had made a pretty bright line distinction between capacity charge as the only place where power agency contributes to a pro-rata share of fixed costs. Is that accurate? My understanding, Your Honor, is that the energy costs under this contract are a complete pass-through. We made that argument repeatedly in our submissions before FERC. And as far as I can tell, nobody disputed that claim, that the energy cost here is a complete pass-through in the entirety of our capacity costs and entirety of our profits. This is a capitalist system. All come from the capacity charge, which they could- But does the pass-through not include, it doesn't include amortization of existing facilities as distinct from capacity, which is about sending signals to build future? That's right, Your Honor. My understanding is that the energy charge is a complete pass-through. But pass-through of what? I'm asking whether, isn't it also pass-through of some amortized asset costs? I believe it's not, but I will correct myself on reply if that is incorrect. Okay. And it's not typical necessarily that peak demand is determined from one day. I mean, under some regulatory systems, it's sampling across different periods. This is the way this contract is written. Your Honor, I'm not familiar with the broad strange. The FERC does say in its order that this is something that is done from time to time on a somewhat basis. And it operated, you know, it's important to understand that that hour is a contractual proxy. No one believes that it only matters how much they draw on us one hour per month. And it's a contractual proxy that works well within the confines of the contract. What they're attempting to do here to the deployment of gridscale batteries is destroy the economics of the entire contract by timing their supply of retail energy just during this one hour. They are basically becoming free. They can give themselves the authority to become complete free riders off our system where they're only paying the pass-through and everyone else, including us, is bearing the capacity costs and of course, no profit for us. All right. If there are no more questions, Mr. Ettinger. Who on my screen seems frozen. Good morning and may it please the court. I'm Scott Ettinger for the Federal Energy Regulatory Commission. Thank you for hearing the case today. I'd like to go to the standard of review and address Judge Tatel's point about if I certainly understand that there's a disagreement about whether the contract language is plain, but in at least two places of Duke's reply brief, they suggest that they have the more reasonable interpretation of the contract. And I would submit that that implies that there is some reasonableness to the- What about counsel's argument that FERC didn't in any order of its brief indicate it's exercising its authority to interpret the language? I would point to this court's division in national fuel, which talked about the question here is whether the contract has directly addressed the precise question. And as- No, I understand that, but his argument is, is it in FERC's brief, the agency did not, in FERC's decision, I'm sorry, the agency did not claim to be exercising its discretion to interpret the contract. I think the only reading of the commission's orders is that it did just that. Battery storage technology is not addressed as we all acknowledge, even Duke acknowledged that. It's not addressed in the contract. The commission's only reference to plain language in the declaratory order and in the rehearing order was to reject Duke's position that the plain language leads us to the outcome that it prefers. The commission also explicitly in paragraph 38 of the declaratory order, this is at JA 24 to 25, said that key terms of the contract are not defined, and that's demands and loads. The commission also discussed that in the rehearing order at page 14. Let me ask you, Mr. Edinger, about this issue that came up with Mr. Settlin about the article 9.5 definition. First of all, I don't know if you read it as I do, that it's susceptible to be read that it allows the power agency to manage or reduce members' demands and our load through the use of pricing information or the communication of pricing information to members' customers, to agencies or members' customers. First, is it in fact ambiguous in that way in your view? And second, if so, does the power agency use pricing information itself to manage or reduce loads? It does. I will concede that this isn't the best drafted language, but I will make one point. The municipal agency doesn't have customers other than the municipalities. The members. If that's to have any meaning whatsoever, what we're talking about there is the municipal agency's use of providing the information to the members. Okay. Their use would qualify as demand response under section 9.5. So it's through the use of pricing information by power agency or the communication of pricing information to the power agency members' customers. And my question is just as a factual matter, is there such a thing as the power agency's own use of pricing information to manage or reduce demand? I think that's something that is contemplated here that the agency is contemplating. I don't know whether they have actually done that here, but that's what they're asking for. By the use of the batteries? Yes. Are there other programs that have that same, that track the language in that same way? That don't have to do with communicating the information onto customers and having them react, but having power agency itself use pricing information itself without communicating onto customers to use pricing information to manage or reduce demands or load. Well, and again, I think here what the commission was getting at was that the agency was communicating that information to the members, to the municipalities, and that they would use it to reduce the load on the system, and from the perspective of Duke's system. But not to the members' customers? Correct. Why do they need to communicate it to the members if there are steps that the power agency itself can take, I guess is what I'm asking. Well, that's, I'm not sure I follow. I'm sorry, Your Honor, this language is difficult. I think, again, the power agency doesn't have customers, and I think what's contemplated here is that they would pass this information on the pricing information that they're entitled to under section 18 of the contract to the municipalities that would use the information to operate the battery storage technology. Okay, I just thought that you had said that how you thought this provision, 9.5 demand response, authorized the use of the batteries. Nobody's saying that information is passed on to customers in the process of using batteries to manage demand or load, right? I think that's correct. And the question is, therefore, do you read this contract to allow that because you read it to allow the power agency to manage or reduce the members' demands or load through the power agency's own use of pricing information as opposed to the power agency's communication of pricing information to members' customers? And I thought you said to that, yes. And I was asking whether there was any precedent for any other kind of management or reduce of demands or loads on the part of power agency that would similarly not involve communication of pricing information to customers, but simply the use of pricing information by the power agency. I'm aware of none, your honor. And what I think is key to this section is it's the manage or reduce the members' demands, not the end users' demands. And I think that's what Duke is asking for here is a simple backing up a few lines in that section. And this is the same language in 9.4 is what they're seeking is that a rewrite of the contract such that the contract only permits managing or reducing the end users' demands and or loads. And that's not what the contract says. The contract speaks in terms of the members' demands or loads. And I think this is the language that the commission was grappling with is determining from what perspective we look at demand. And that's what led the commission to, as I was saying before, those terms are not defined in this contract. And that's what led the commission to look at the definition of hourly demand in section 1.77. And I also want to highlight section 9.3. This was important in the commission's analysis. We're talking about consumption and getting back to my comment about perspective on whether this contract requires the customers to do anything. And that section is very clear that it is talking about actual consumption. And that's, I would suggest that that's by negative inference, that means we're talking about something very different in sections 9.4 and 9.5. What's your response to council's argument that what the commission has done here is completely blown up this contract? I would disagree with that, Your Honor. I thought you might, why? There's no record support for that. The idea that something cataclysmic, disastrous has happened here. I'm aware of no record support for that argument. Well, because nothing's happened here yet. It's all about approving something that might happen in the future. That's correct, Your Honor. And I would point out as well that the commission addressed this in rehearing and in particular, the last two paragraphs of the rehearing order, paragraph 15 at JA 33 to 34 and paragraph 16. This contract- What did it say there? I'm sorry, Your Honor. I'm sorry, what did it say there? It addressed the idea that this contract permits a revision if there, if it doesn't believe- They can come back to the commission. This paragraph 16, right? It's actually 15 where we cite section 18- Well, I was close, yeah. Of the contract, and that's at JA 194. You mentioned that 9.3, but did the commission's order rely on 9.3? It did, Your Honor. And it did in paragraph 38. This is at JA 24 to 25. And I believe it repeated that similar analysis. Hearing order, in particular, paragraph 14 of the rehearing order at JA 33. This gets very short shrift attention in the Duke's briefs. And I think it's a very telling provision for understanding why consumption, the reduction of consumption was not contemplated in these two sections. And I think the commission was on firm ground in rejecting that argument by Duke for that reason. All right, if there are no more questions, why don't you take two minutes and reply? Thank you, Your Honor. Just three brief points. First, Judge Pillard, I was correct that the energy charge includes only the pass-through amount and maintenance, no amortization of fixed costs. With regard to 9.3 that my friend just mentioned, that's energy efficiency. That's like installing more efficient light bulbs that has nothing to do with demand-side management and demand response, which is modifying the patterns of electrical usage, power agency taking over your thermostat, turning it down, turning it up, or they're sending you pricing information so you can run your washing machine overnight and things of that sort. And then the final point that- When you talk about power agencies taking over your thermostat, is that under Article 9.5? Isn't that the kind of thing where it doesn't need to, on that, in real time, communicate information to consumers? It just needs to react itself to what it knows is a coming peak and take action based on other information it's collected in the past. That's 9.4, Your Honor. That doesn't involve any communication or pricing information to the consumer, but it does involve a consumer signing up for a program that will modify the pattern of the consumer's usage. So the thermostat where power agency uses in the words of 9.5, or the definition of 9.5, 1.47, centralized control, that's what that means. And so the customer says, yes, I want to save some money, power agency. So- So give me, in your view, the classic example of demand-side management and the classic example of demand response. The classic demand-side management is what I was just describing, Your Honor, where you allow a power agency to control your thermostat or to pre-cool your building before they know a peak is happening. That is classic demand-side management. Classic demand-side response is you get an app on your phone that tells you if it's going to cost you more, you as the consumer is going to cost you more money to run your washing machine now. And you look at your app and say, oh, look, it's going to cost me, I'm going to save some money if I don't run it now if I run the washing machine overnight. So you decide, you yourself decide not to run your washing machine now, run it overnight because you've gotten some pricing information from power agency. I should have asked Mr. Ettinger this, but I just don't think you're right that consumers' prices fluctuate based on the day or time of day that they're using energy. I believe that the way the demand-side response program works is that they give you financial incentives to do that precisely. They give you savings to, if you so choose on yourself, to not run it at a certain time and run it at other times. Okay. And then the final point, Rana, is one you've asked about. I just don't think about 9.5 and the word use. I just don't think that textually works. And it wasn't certainly a textual analysis that FERC did here. I think you would say you would have to kind of take out or communicate pricing information. Well, you use it as an alternative, which is what or denotes. Through the use of pricing information, but then you would take out the back end of it. You basically, as I understand that reading, and it wasn't presented by my friends on the other side, is you'd say through the use of pricing information, but then you would take out the end of it. And so then you would have a sentence that's kind of like split into two and rewritten. And I would say, Your Honor, that's creative, but I think that is outside the bounds of traditional understanding of text. And I think that, and certainly wouldn't get someone, wouldn't get the agency beyond the equivalent of Chevron step one. And for those reasons, I would urge Your Honors to vacate the orders below. All right, thank you. Madam Clerk, would you please adjourn court?
judges: Henderson, Tatel, Pillard